**UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

TAMARA WILSON, *individually and on
behalf of all others similarly situated*,

      Plaintiff,

      v.

TRILLER, INC., a Delaware corporation,

      Defendant.

Case No.:  21-cv-11228

**CLASS ACTION COMPLAINT**

<u>DEMAND FOR JURY TRIAL</u>

**Dated:**  December 31, 2021

Plaintiff TAMARA WILSON, individually and on behalf of all other similarly situated persons ("Plaintiff"), brings this class action against TRILLER, INC. ("Triller" or "Defendant"), and alleges as follows based on investigation of counsel and information and belief:

## NATURE OF THE CASE

1.     Defendant Triller maintains and operates a popular social media application ("Triller App" or the "App") that allows users to view, share, upload, and create short videos. Individuals who wish to upload videos to the platform in addition to viewing posts from other users must download the App and create an account.

2.     Unknown and undisclosed to users, Triller engages in a number of practices that violate various state consumer protection and privacy laws—including obtaining and storing biometric and video viewing information, not providing consumers with a retention schedule for use and storage of biometric information, and tracking and disclosing user watch histories without appropriate consent.

3.     This action seeks an order: (a) enjoining Triller from further unauthorized collection, storage, and use of certain of consumers' information; (b) declaring that Triller's conduct violates the Computer Fraud and Abuse Act, the Video Privacy Protection Act, and state consumer protection statutes; (c) finding that Plaintiff and the Class members are entitled to statutory damages, as well as quantum meruit for unjust enrichment based upon Triller's actions; and (d) requiring Triller to clearly and conspicuously disclose its written policy that sets forth its retention and use of Plaintiff's and Class members' biometric information.

## PARTIES

**Plaintiff**

4.      Plaintiff **Tamara Wilson** is a citizen and resident of the State of Illinois. Plaintiff Wilson downloaded Triller and used her account for approximately six months. She no longer has the app on her phone, and, while using it, estimates that she used the app approximately one hour per day.

5.      Plaintiff Wilson at no point uploaded or posted any videos using Triller.

6.      Plaintiff Wilson viewed and "liked" other videos, commented on videos, and sent messages to other viewers concerning their videos.

7.      Plaintiff Wilson does not recall seeing the Terms of Service or Privacy Policy upon registering for an account with the App.

**Defendants**[1]

8.      Defendant **Triller, Inc.** is a Delaware corporation with its headquarters in New York, New York.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because: (a) this is a proposed class action in which there are at least 100 Class members; (b) the parties are minimally diverse, as Plaintiff and Defendant are domiciled in different states; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs.

---

[1] Plaintiff may add additional defendants after additional discovery further demonstrates its connection to the allegations set forth herein.

10.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff brings a claim pursuant to federal law, the Video Privacy Protect Act, as alleged herein.

11.     This Court has personal jurisdiction over Triller because Triller regularly conducts business throughout New York and its principal place of business is in New York.

12.     Venue is also appropriate in this District because Triller's Terms of Service provide that all actions must be brought in either state or federal court in New York.

## COMMON FACTUAL ALLEGATIONS

### A.     Overview of the Triller App

13.     Triller is a video sharing social media network which was launched in 2015 by co-founders David Leiberman and Sammy Rubin. In its original iteration, the App allowed users to create and share their own music video creations. The App allows users to create videos of no more than fifteen seconds in length, and synchronize those videos with Triller's library of music, creating short music videos.

14.     Users can select background music from Triller's library of music, edit the background music to choose what portions of the song to use in the videos, record a 15-second video, edit the video or add filters, and then upload the finished video to share with others on the Triller platform or on other social media platforms. Once uploaded, Triller allows users to download or share videos with others, which Triller claims "democratizes the music video creation process," letting users create their own high-quality music videos to share elsewhere.

15.     In 2016, Triller expanded the success of its App by building out its social networking services, allowing users to follow each other and share their videos publicly. In this vein, Triller has positioned itself as a major competitor with other video-based social media platforms, such as TikTok.

16.     More specifically, Triller allows users to share their videos with other users designated as "friends" and then edit them together before sharing on the Triller app. The Triller App also provides a feed of recommended videos for each user based on the user's previous follows, views, and comments on the App.

17.     The Triller App also offers a "Discovery" feature that allows users to search for and listen to different songs that are featured or trendy, or search for specific songs or users.

18.     Much like TikTok, a Triller user can follow other Triller creators, like and comment on videos, search for videos to watch, and record and share videos. Another critical similarity between TikTok and Triller is that a user does not need to have a Triller account to watch content on the platform.

19.     Triller has grown through a mixture of angel investment and venture capital infusion, including a reverse merger with Triller's current parent company, Proxima Media, LLC.

20.     In November 2020, Triller expanded again to cover the sports promotion and distribution of pay-per-view events, such as the boxing match between Mike Tyson and Roy Jones, Jr.  Users could watch this video content through the Triller App.

21.     In February 2021, Triller launched TrillerTV, which makes 30 minute "live shows" available to Triller account holders through the Triller App.[2]  TrillerTV show hosts include Jennifer Lopez, DJ Khaled, 2 Chainz, Perez Hilton, JR Smith, and other popular celebrities.

---

[2] Triller Launches Linear TV, A-List Lineup (Feb. 12, 2021), https://money.yahoo.com/triller-launches-linear-tv-list-154000553.html.

22.     Triller now boasts over 350 million users worldwide.[3]   Based upon recent valuations that were performed in accordance with merger discussion, Triller's value is approximately $5 billion.[4]

23.     Triller sports a visually appealing, intuitive user interface ("UI"), using vibrant colors and small, intricate gifs to keep the user engaged throughout the entire experience. As a social media platform, the UI is particularly attractive to teens and young adults, Triller's target demographic.

24.     According to Proxima Media, LLC, Triller's parent company, the app's largest demographic is made up of those aged 16-27 in the United States.

25.     Upon launching the App, Triller offers the user several different "page" options through its simplified UI. The options provided to a user who is not signed in are "Following," "Trills," "For You," "Activity", and a button to record a video. In addition, a user who is not signed in is presented with a "Home," "Search," "Create," "Discovery," and "Profile" buttons. Of these, the "Record," "Following," "Activity," and "Profile," buttons will take the user to a page where they are invited to either sign in or register a new account.

26.     Once signed in, each of the above buttons becomes accessible. "Following" provides a list of accounts that a user can parse through and select to follow, and will also gather "Trills" created by creators that the user follows.

27.     "Trills" provides a "Trills" recorded by famous, well-followed, or otherwise noteworthy accounts in an effort to engage users and to provide users with new accounts to follow.

---

[3] Echo Wang, Triller owner in merger talks to go public—source, Reuters (Dec. 13, 2021), https://www.nasdaq.com/articles/triller-owner-in-merger-talks-to-go-public-source.

[4] Aisha Malik, TikTok rival Triller to go public via merger with SeaChange International, Tech Crunch (Dec. 22, 2021), https://techcrunch.com/2021/12/22/tiktok-rival-triller-to-go-public-via-merger-with-seachange-international/.

28.     "For You" provides an algorithmically driven set of Trills that Defendant has curated that they believe will meet a user's taste and interest the user based upon the users "likes" of prior videos. The vast bulk of those videos are likely from people the user does not know, collated by the App's algorithm.

29.     Triller's algorithm is designed to ensure that users see videos and content that they like. This algorithm also allows advertisers to design and optimize ad campaigns to users that are more likely to click on them.

30.     To post, comment, or like videos, or to watch TrillerTV, users must create a Triller account.[5] When creating an account, users are prompted with a disclosure regarding the various ways to sign up for an account.

31.     In fine print, at the bottom of the sign-up screen is a disclosure regarding Triller's terms. This disclosure states that, "[b]y signing up you accept the terms of service [hyperlink] and privacy policy [hyperlink]." But the Terms of Use and Privacy Policy documents are not featured on the page nor is review presented as a mandatory step for using the App.   This screen is shown on the following page:

---

[5] Users do not need to sign up for an account to watch short videos on Triller.



32.     If the user clicks "Create a new account", they are prompted with another screen requesting that they enter their email address, username, and password. At the bottom of this screen, there is a disclosure stating, "[b]y signing up you agree to the terms of service [hyperlink] & privacy policy [hyperlink]." Alternatively, if the user chooses any of the "Continue with" options, no additional disclosure about the terms is displayed to the user.

33.     While public information regarding the reach of the Triller app varies, as of October of 2020, Triller majority shareholder and owner Ryan Kavanaugh boasted that Triller "is up to 231 million downloads worldwide and has 65 million active monthly users."[6]

34.     Triller saw a jump in popularity after the Trump Administration publicly proposed banning TikTok from American mobile app stores because of its ties to the Chinese government. For the first time, in August of 2020, Triller overtook TikTok in Apple's App Store, claiming the top spot in Free Apps in 85 countries, including the United States.[7]

**B.     Through Its Audio Synching Feature, Triller Analyzes Users' Facial Imprints**

35.     Unlike similar video creation apps (*e.g.* TikTok), the Triller App uses artificial intelligence ("AI") to edit distinct clips into music videos for users instead of providing a more robust set of editing tools. Triller co-founders, David Leiberman and Samuel Rubin, had previous experience creating this technology for an interactive music app Mibblio, which became a platform for artists to offer music to kids in an immersive and "playable" format.

36.     Leiberman and Rubin authored a Triller-owned patent titled "Systems and Methods for Creating Music Videos Synchronized With an Audio Track" (U.S. Patent No. No. 9,691,429), which provides for a method of "creating a music video in which a plurality of video takes are synchronized to an audio track".  The patent explains that certain audio tracks will be suggested to a user based on an analysis of that user's video content, including recognition of the faces within the video. The patent specifically explains that "[w]hen a face appears within a captured video take

---

[6] Trump, Triller, and the return of Ryan Kavanaugh, FastCompany (Oct. 15, 2020),https://www.fastcompany.com/90563686/trump-triller-and-the-return-of-ryan-kavanaugh.

[7] Andrea Bossi, Triller Overtakes TikTok, Jumps to No. 1 in Appp Store as Drama Continues, Forbes (Aug. 3, 2020), https://www.forbes.com/sites/andreabossi/2020/08/03/triller-jumps-to-no-1-on-the-app-store-overtakes-tiktok-as-drama-continues/?sh=a4abb766d4aa.

that is substantially similar to a face recognized within a certain contact's photograph, that face will be recognized by the user device as being within the captured video take."[8]

37.     Triller admits that it uses the audio synching functionality described in this patent and has brought civil action to defend its infringement. In a July 29, 2020 complaint, Triller alleges a competitor application, TikTok, infringed upon this audio synching patent. Triller's suit shows that Triller actively uses technology that recognizes and collects facial imprints.

### C.     Triller Automatically Transfers Users' Personally Identifiable Information to at Least Two Corporate Affiliates

38.     Unbeknownst to users, Triller is transferring users' personally identifiable video viewing information to Triller's corporate affiliates, Facebook and Appsflyer.

39.     Triller assigns certain Unique Identifiers to each user, including (but not limited to) a "handle," or name that the user picks for themselves, a unique number ("UID") that corresponds in Triller's internal databases to that handle (collectively referred to herein as "Unique Identifiers").

40.     These Unique Identifiers are associated only with one user account and are persistent across devices.

41.     In addition, each unique device used to access the Triller app is assigned a unique "advertiser_id."

42.     Triller transmits the UID and advertiser_id to Facebook and Appsflyer, along with other personal information while a user is logged on to the platform.

---

[8] David Leiberman and Samuel Rubin, *Systems and methods for creating music videos synchronized with an audio track*, U.S. Patent No. 9,691,429, at 20 (June 27, 2017) (assigned to Triller on August 18, 2017); *see also* David Leiberman and Samuel Rubin, Systems and methods for creating composite videos, U.S. Patent No. 10,681,408 (June 9, 2020).

43.     When a user visits her profile page, Triller pairs the UID and handle with other data from the user's profile page including (but not limited to) anything written in the "About Me" section, the URL of the photo chosen by the user for as an avatar (a photographic representation of the user) on the app, whether or not the user has a linked Instagram account (and, if so, the linked Instagram handle), whether or not the user has listed a Soundcloud URL or linked Snapchat account, and any photos or videos viewed and/or liked by the user on her profile.

44.     By pairing this information with the UID, Facebook and Appsflyer can easily associate UIDs with the individual user.

45.     Further, when a user watches a video, an event indicating the video ID and the creator handle is created and sent to both Facebook and Appsflyer, regardless of whether or not the user watching the video has connected a Facebook (or any other) account to Triller.

46.     For example, if a user watches a video by creator "charlidamelio," a portion of the data sent to Facebook contains the following string:

> "video_user_name":"charlidamelio","position":"0","muted":"true",
>
> "video_id":"64266234"

47.     For data sent to Appsflyer, the same traffic has:

> "video_user_name\":\"charlidamelio\",\"position\":0,\"muted\":true
>
> ,\"video_id\":64266234}

48.     With the username of the creator (in this example, "charlidamelio") and the "video_id" number (in this example, "64266234"), which are sent by Triller to its corporate affiliates anytime the user watches that video, those corporate affiliates (or anyone else) can find the videos watched by simply entering the data into a simple URL format, e.g.: "https://triller.co/@charlidamelio/video/64266234."

49.     Generically, this format is consistent across the website: as long as one has a creator handle and a video ID number, one can identify exactly what video was watched by the user. The generic URL one can enter to obtain this information is: https://triller.co/@(handle)/video/(video_id).

50.     Triller couples together a user's UID with the Video ID and the creator's handle to create a package of data which is then sent to Facebook and Appsflyer.

     a.  When sent to Facebook, the data is sent to the domain "graph.facebook.com."

     b.  When sent to Appsflyer, the data is sent to the domain "inapps.appsflyer.com."

51.     This data is sent to Triller's corporate affiliates each and every time a video is viewed by a user, regardless of where the video is viewed on the App.

52.     For example, when the user likes a video by the video poster "lexijadye", Triller transmits the following information to one of its corporate affiliates:

{"_eventName":"social_liked_video","_eventName_md5":"c432d71b7e7b6fb006cf231d48e8ec61","_logTime":1616796579,"_ui":"unknown","_session_id":"e3e9a1c0-852e-4c75-a94e-ec8235172d8f","country_code":"US","triller_session_id":"fef4838a-b841-  4d09-af3a-a013c729049b","user_id":"438861246","feed_position":"18","video_user_name":"lexijayde","language":"English","version_info":"v24.1b7","position":"18","video_user_id":"14480127","video_id":"63163294"}

53.     This data indicates the fact that the user liked a given video, and includes:

    a.   The user's unique UID (e.g. "438861246");

    b.  The video poster's account name, or "handle" (e.g.; "lexijayde");

     c.   The video poster's unique UID (e.g.: "14480127"); and

     d.   The unique identifier for the video itself, or "video_id" (e.g.: "63163294").

54.    The information transmitted to these domains also includes the region where the user resides by country (*e.g.* U.S.), time-zone of the user and the user's device information.

55.    Triller associates the same UID to an individual user when it shares information to Facebook and Appsflyer. When a user logs on to Triller from a new device, Triller then begins associating the same UID to that user. Even after a user has cleared her browser history and cleared her cookies, the Triller App will continue pairing the same UID with the video viewing information it transmits to Facebook and Appsflyer while the user is logged on. The additional Unique Identifiers that Triller transmits allow Facebook and Appsflyer to continue identifying a user's viewing activity even when the user is no longer logged on but is still viewing videos on the platform.

56.    As the user navigates through videos on Triller's platform, Triller continues to transfer user's personally identifying video viewing history.

57.    For instance, Facebook creates custom events, which collect detailed information about interactions with the App, including:

     a.   when a video is loaded (video_view)

     b.   when a video plays (video_watched)

     c.   when a video is liked (social_liked_video)

     d.   when another user is visited (social_view_profile)

58.    In addition, these events are time-stamped, so the time that a user spends watching each video is recorded.

59.    The identity of the video maker and the video identifier are also recorded.

60.     As a result, Facebook can easily compile a dossier on any given user which aggregates the user's video watch history and associates it with their PII.

**D.      Triller Collects and Discloses Data Without Informing or Obtaining Consent from Users, in Violation of the Video Privacy Protection Act**

61.     Triller violates the Video Privacy Protection Act ("VPPA") by maintaining and disclosing data, without informing Plaintiff and without obtaining the consent of Plaintiff, in violation of 18 U.S.C. at § 2710.

62.     Triller is a "video tape service provider" ("VTSP") under 18 U.S.C. § 2710(a)(4) because Triller regularly delivers video content to users and maintains a cache of videos and virtual materials, including content from users, verified users, and advertisers.

63.     Plaintiff and Class members are "consumers" under the VPPA because they are "subscriber[s] of goods or services" from Triller. 18 U.S.C. § 2710(a)(1).

64.     Plaintiff and Class members provided personally identifiable information to Triller in order to sign up, become registered users, establish user profiles, and engage in Triller's video streaming content and services.

65.     The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief" provided for under the statute. 18 U.S.C. § 2710 (b)(1).

66.     Triller violates the VPPA by knowingly disclosing to third parties users' personally identifiable information including, but not limited to, each user's unique and interchangeable handle and identifier number (persistent across different devices), identifier information about what videos users played, how long they are played, time stamps at which a video is paused and/or stopped, videos users liked, and when a user has visited the profile of another user. *See* 18 U.S.C.

§ 2710(a)(1)(3) (defining "personally identifiable information" to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider[.]").   This information is specific enough to identify individual consumers.[9]

67.    The VPPA does allow a VTSP to disclose personally identifiable information so long as the VTSP obtains the "informed, written consent" of the consumer, which requires the: (a) disclosure be "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer"; (b) "made at the election of the consumer" either "at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, which is sooner"; and (c) the VTSP has provided an "opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(b)(2)(B).

68.    Triller does not provide distinct and separate disclosure regarding users' video watches or other gathered video-watching data, nor does it require written consent distinct from other forms of consent or obligations either at the time Triller sought to disclose users' video viewing histories or in advance of sharing those viewing histories for a set duration of time. Triller also does not allow for users to withdraw from ongoing disclosures, as required by the VPPA.

69.    Triller's Privacy Policy states that it "may use third parties to outsource one or more aspects of our business and/or Platform operations (including, but not limited to, email or customer service functions, data processing, web analytics, maintenance, online advertising, certain

---

[9]  Big Data May Not Know Your Name.   But It Knows Everything Else, Wired, https://www.wired.com/story/big-data-may-not-know-your-name-but-it-knows-everything-else/.

augmented reality functionalities, certain social media plug-in integrations, and security execution and clearing services),″ and may provide User "Personal Information" to such third parties in connection with the performance of such activities.[10] Triller's Privacy Policy also states that it may disclose to "network advertisers, ad agencies, analytics service providers, and other vendors" certain information about "pages viewed, content interacted with, and actions taken by Users when visiting the Platform" so that it may "serve advertisements on other web sites, within mobile apps and elsewhere online; and to provide [Triller] with information regarding the use of the Platform and the effectiveness of our advertisements and other marketing campaigns."[11] But these disclosures do not meet the requirements of the VPPA, because the disclosures are not made in a separate and distinct policy—rather they are buried within Triller's Privacy Policy—and do not set out the length of time that information will be disclosed. Thus, Triller did not obtain "informed, written consent" as called for by the VPPA.

### E.    Triller Obscures the Terms of Use and Privacy Policy

70.    Triller also makes no effort to ensure that users see the full text of its Terms of Use and Privacy Policy.  When downloading the App, there is no requirement that the user agree to any of the privacy provisions set out in the Privacy Policy.

71.    Indeed, to access the Privacy Policy, a user must access the Profile Page, find a tiny gear in the top right of the screen, tap on that gear, then find the "Privacy Policy" under the "Legal" section in the settings.

72.    There is no requirement that a user read or accept the disclosures in the Privacy Policy before using the App.

---

[10]    Privacy Policy (last updated Dec. 17, 2020), https://support.triller.co/hc/en-us/articles/360053977512-Privacy-Policy.

[11] *Id.*

73.     There is no pop-up or other notification that the App even *has* a Privacy Policy, much less that a user is agreeing to the terms of such a policy by using the App.

74.     Only by attempting to log in or sign up is the user brought to a page that makes reference to "Terms of Service" and "Privacy Policy."

75.     These terms are placed at the very bottom of the page in much smaller type than any of the other links on the page.

76.     Triller intends this design to have the effect of a clickthrough legal agreement—in other words, when users click any of the buttons that allow a user to create a new account or log in with the user's email or through other applications, Triller considers this to be acceptance of a contract.  But Triller has made a number of design decisions that increase the likelihood of the legal agreement not being noticed by the end user.  Specifically:

     i.     The text is the smallest text on the page.  This reduces the legibility of the information and makes it possible for users to not even notice it;

    ii.     The text is positioned at the bottom of the page, below all of the other brightly colored login or sign-up buttons—meaning that in certain situations, some users may have their viewpoint arranged so that the legal agreement is hidden "below the fold" (*i.e.*, off-screen), and they proceed to link an account, sign up, or log in without ever seeing the text;

   iii.     The Terms of Service and Privacy Policy documents are not presented as a mandatory step, nor is the user required to select a checkbox or radio button to explicitly indicate that they have read and understood them (meaning that a user can tap any of the account link, sign in, or register buttons without noticing or reading the Terms of Service and Privacy Policy).

77.     Importantly, a user can install the Triller app and become a Triller content customer without proceeding through a clickthrough agreement containing the Terms of Use and Privacy Policy.  For example, the user may go directly to the Apple iOS App Store, download the App, and start using it to look at videos.  In that series of steps, the user is not shown any information about, nor links to, the Terms of Use or Privacy Policy.

78.     Triller's designers have the ability to ensure that consumers read Triller's Terms of Service and Privacy Policy, but they have elected not to do so.  For example, Triller designers have required users to provide their birthday (meaning that 100% of users who complete the sign-up process must provide a date of birth, but not all users will have read the Terms of Use or Privacy Policy).

79.     Requiring consumers to read and review terms of use with an explicit opt-in has been common practice in the design of end-user license agreements since the 1990s.

80.     By making the Terms of Use and Privacy Policy difficult to read, and by not requiring consumers to read those documents, Triller is able to hide terms that insulate them from lawsuits.

### F.     Fraudulent Concealment and Tolling

81.     All applicable statutes of limitation have been tolled by Triller's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.

82.     Instead of disclosing Triller's practice of collecting, storing, using, and disclosing users' biometric identifiers and biometric information, as well as users' personally identifiable information and video viewing information, Triller concealed this practice from users by not

disclosing it to users or making this information otherwise available. Triller concealed this information to encourage users to download and use the App.

83.    Despite reasonable diligence on her part, Plaintiff remained ignorant of the factual bases for her claims for relief. Triller's withholding of material facts concealed the claims alleged herein and tolled all applicable statutes of limitation.

## CLASS ACTION ALLEGATIONS

84.    Plaintiff seeks certification of the classes set forth herein pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"). Specifically, Plaintiff seeks class certification of all claims for relief herein on behalf of a class and subclass defined as follows:

    a.    **Nationwide Class**: All persons who reside in the United States who used the Triller App. or, in the alternative:

    b.    **Multistate Consumer Protection Class**: All persons who reside in Illinois or any state with materially similar consumer protection laws[12] who used the Triller App.

---

[12] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include but are not limited to: Arkansas (Ark. Code § 4-88-101, *et seq.*); California (Cal. Bus. & Prof. C. §§ 17200 and 17500 *et seq.*); Colorado (Colo. Rev. Stat. § 6-1-101, *et seq.*); Connecticut (Conn. Gen. Stat. § 42-110, *et seq.*); Delaware (Del. Code tit. 6, § 2511, *et seq.*); District of Columbia (D.C. Code § 28-3901, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Hawaii (Haw. Rev. Stat. § 480-1, *et seq.*); Idaho (Idaho Code § 48-601, *et seq.*); Illinois (815 ICLS § 505/1, *et seq.*); Maine (Me. Rev. Stat. tit. 5 § 205-A, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); Montana (Mo. Code. § 30-14-101, *et seq.*); Nebraska (Neb. Rev. Stat. § 59 1601, *et seq.*); Nevada (Nev. Rev. Stat. § 598.0915, et seq,); New Hampshire (N.H. Rev. Stat. § 358-A:1, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New Mexico (N.M. Stat. § 57-12-1, *et seq.*); New York (N.Y. Gen. Bus. Law § 349, *et seq.*); North Dakota (N.D. Cent. Code § 51-15-01, *et seq.*); Oklahoma (Okla. Stat. tit. 15, § 751, *et seq.*); Oregon (Or. Rev. Stat. § 646.605, *et seq.*); Rhode Island (R.I. Gen. Laws § 6-13.1-1, *et seq.*); South Dakota (S.D. Code Laws § 37-24-1, *et seq.*); Texas (Tex. Bus. & Com. Code § 17.41, *et seq.*); Virginia (VA Code § 59.1-196, *et seq.*); Vermont (Vt. Stat. tit. 9, § 2451, *et seq.*); Washington (Wash. Rev. Code § 19.86.010, *et seq.*); West Virginia (W. Va. Code § 46A-6- 101, *et seq.*); and Wisconsin (Wis. Stat. § 100.18, *et seq.*). See Mullins v. Direct

    c. **Illinois Subclass**: All persons who reside in Illinois and used the Triller App to view and/or create one or more videos.

85.    Plaintiff is the proposed class representative for the classes asserted herein.

86.    Plaintiff reserves the right to modify or refine the definitions of the Class and the Subclasses.

87.    Excluded from the Class and the Subclasses are: (a) any judge or magistrate judge presiding over this action and members of their staff, as well as members of their families; (b) Triller, Triller's predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Triller or its parents have a controlling interest, as well as Triller's current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Triller; and (f) the legal representatives, successors, and assigns of any such excluded persons.

88.    **Ascertainability.** The proposed Class and Subclasses are readily ascertainable because they are defined using objective criteria so as to allow Class and Subclass members to determine if they are part of the Class and/or the Subclasses. Further, the Class and Subclasses can be readily identified through records that Triller maintains.

89.    **Numerosity (Rule 23(a)(1)).** The Class and Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of Class and Subclass members, as herein identified and described, is not known, but download figures indicate that the Triller App has been downloaded more than 100 million times in the United States.

---

Digital, LLC, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), aff'd, 795 F.3d 654 (7th Cir. 2015).

90.     **Commonality (Rule 23(a)(2)).** Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

a.   Whether Triller engaged in the activities and practices referenced above;

b.   Whether Triller's activities and practices referenced above constitute a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

c.   Whether Triller's activities and practices referenced above constitute a violation of the Illinois Consumer Fraud Act, 815 ILCS §§ 505, *et seq*.;

d.   Whether Triller's activities and practices referenced above constitute unjust enrichment concerning which restitution and/or disgorgement is warranted;

e.   Whether Triller's activities and practices referenced above constitute a violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*;

f.   Whether Plaintiff and the other Class and Subclass members sustained damages as a result of Triller's activities and practices referenced above, and, if so, in what amount;

g.   Whether Triller profited from their activities and practices referenced above, and, if so, in what amount;

h.   What is the appropriate injunctive relief to ensure that Triller no longer unlawfully: (a) take private and personally identifiable Triller user data and content—including User/Device Identifiers, biometric identifiers and information, Private Videos and Private Video Images, and video viewing histories; (b) use private and personally identifiable Triller user data and content to develop and patent commercially valuable artificial intelligence

technologies; (c) use private and personally identifiable Triller user data and content to create consumer demand for and use of Triller's other products; (d) cause the diminution in value of Triller users' private and personally identifiable data and content; (e) cause injury and harm to Triller users' mobile devices; (f) cause Triller users to incur higher data usage and electricity charges; (g) retain the unlawfully acquired private and personally identifiable data and content on Triller users; and (h) profile and target, based on the above activities, Triller users with advertisements.

i.   What is the appropriate injunctive relief to ensure that Triller takes reasonable measures to ensure that it and relevant third parties destroy unlawfully-acquired private and personally identifiable Triller user data and content in their possession, custody or control.

91.   **Typicality (Rule 23(a)(3)).** Plaintiff's claims are typical of the claims of the other Class and Subclass members' claims, because, among other things, Plaintiff and the other Class and Subclass members sustained similar injuries as a result of Triller's uniform wrongful conduct and their legal claims all arise from the same events and wrongful conduct by Triller.

92.   **Adequacy (Rule 23(a)(4)).** Plaintiff will fairly and adequately protect the interests of the other Class and Subclass members. Plaintiff's interests do not conflict with the interests of the other Class and Subclass members, and Plaintiff has retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Class and Subclasses.

93.   **Predominance & Superiority (Rule 23(b)(3)).** In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining this action as a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions

affecting only individual Class and Subclass members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to Plaintiff is insufficient to make litigation addressing Triller's conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

94.     **Final Declaratory or Injunctive Relief (Rule 23(b)(2)).** Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(b)(2). Triller has acted or refused to act on grounds that apply generally to the Class and Subclasses, making final declaratory and/or injunctive relief appropriate with respect to the Class and Subclasses as a whole.

95.     **Particular Issues (Rule 23(c)(4)).** Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class and Subclass members and are capable of class-wide resolution that will significantly advance the litigation.

## CAUSES OF ACTION

## NATIONWIDE CAUSES OF ACTION

96.     Plaintiff asserts the following causes of action on behalf of themselves and the other members of the Nationwide Class. These claims are brought individually under the laws of the United States and all relevant state laws, on behalf of all other natural persons whose Private

Information was surreptitiously collected by Triller without their knowledge or consent, and reside in states having similar laws regarding customer records.

## FIRST CLAIM FOR RELIEF

## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT

## 18 U.S.C. §§ 1030, *et seq.*

## (On Behalf of Plaintiff, the Nationwide Class, and, in the alternative, Subclasses)

97.     Plaintiff, individually and on behalf of the other Class members, repeats and reallege Paragraphs 1 through 95, as if fully alleged herein.

98.     The mobile devices belonging to Plaintiff and Class members are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2)(B) in that they are "used in or affecting interstate or foreign commerce or communication[.]"

99.     Triller caused Plaintiff and Class members to download and install the App to their mobile devices without informing users that the App contained code that went beyond what users expected the App to do, the information that was collected by the App, and the information that was disclosed by the App.

100.     By surreptitiously collecting, storing, and using Plaintiff's and the other Class members' personally identifiable information without prior disclosure and consent, Triller knowingly exceeded its authorized access to Plaintiff's and the other Class members' protected computers, in violation of 18 U.S.C. § 1030(a)(2)(C).

101.     Triller's actions caused injuries to users as set forth herein because of the numerous threats to public safety caused by Triller's surreptitious violations of user privacy, and failure to obtain consent before collecting and disclosing certain user information.

102.     Plaintiff, individually and on behalf of the other Class members, accordingly seeks compensatory damages, injunctive relief, and other equitable relief as allowed by 18 U.S.C. § 1030(g).

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**

**18 U.S.C. § 2710, *et seq.***

**(On Behalf of Plaintiff, the Nationwide Class, and, in the alternative, the Subclasses)**

103.     Plaintiff, individually and on behalf of the other Class members, repeats and reallege Paragraphs 1 through 95, as if fully alleged herein.

104.     The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1). Defendant Triller violated this statute by knowingly disclosing Plaintiff's and other Class members' personally identifiable information to Facebook, Appsflyer, and other corporate affiliates.

105.     Defendant Triller is a "video tape service provider" under 18 U.S.C. § 2710(a)(4) because it "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." Triller is engaged in the business of delivering video content and services to its users, including Plaintiff and the other Class members. Triller's platform allows users to create, post, share, view, and otherwise engage with videos. Triller platform is built to deliver video content to consumers. Triller regularly delivered videos to Triller's subscribers, including Plaintiff and the other Class members, by making those materials electronically available to Plaintiff and the other Class

members on Triller's platform. Triller also allowed users to create and share videos with a non-public audience.

106.    Plaintiff and the other Class members are "consumers" under 18 U.S.C. § 2710(a)(1) because they are "subscriber[s] of goods or services" from Triller. Plaintiff and the other Class members are registered Triller users who use the website and mobile application through interaction with it. Plaintiff and the other Class members were required to provide personally identifiable information to Triller, including date of birth, in order to sign up, become registered users, establish user profiles, to subscribe to "follow" other accounts, and to contribute to Triller's video streaming content. By signing up for accounts with Triller, becoming registered users, establishing user profiles, providing Triller with personal information, and spending time and attention using and contributing to Triller's video streaming platform, Plaintiff and the other Class members entered into transactions with Triller to obtain access to Triller's content and services and for the purpose of subscribing to Triller's video streaming content and services.

107.    The VPPA defines "personally identifiable information" to "include[] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(1)(3). Triller "knowingly disclose[d]" to corporate affiliates users' personally identifiable information, including what videos a user has watched; whether a user has engaged with videos by downloading, liking, commenting and/or sharing the video; how long the user views the video; whether the user saves the video to their "Favorites" page; and accounts the user follows. Triller's disclosure also included personally identifiable information because the information shared included a user's: username, device information, and location data.

108.    Defendant Triller disclosed personally identifiable information to corporate affiliates Facebook and Appsflyer, through the transfer to at least three domains: "graph.facebook.com.", "inapps.appsflyer.com."

109.    Every time a user visits the platform, Triller transfers to its corporate affiliates through their selected domains: the advertiser_id, which is unique to each user, and functions as a user id; the user_id, which corresponds to the unique user name chosen by the user; the user_id of the creator of the video watched; the video ID of the video watched; the duration that the user watched the video for; and the time the user watched it. Triller also creates a unique "session_id" which groups together for one user all videos watched, liked, shared, or otherwise interacted with into a single identifiable event.

110.    Triller maintains the same UID for each individual user. While a user is logged on to the platform, Triller pairs the same UID with the video viewing information it transmits to its corporate affiliates. This UID follows the user every time she logs on to the platform regardless of the device. The additional Unique Identifiers that Triller transmits to its corporate affiliates allow them to continue identifying users' viewing activity. When the user visits her profile page, these Unique Identifiers are easily linked to the user's account name, and profile page. The profile page contains information that can further identify individuals by name since it includes an uploaded biography and videos that the user has shared.

111.    Triller's pairing of personal information, including user's account name and Unique Identifiers, with users' video viewing history violates the VPPA because it readily shows which requested or obtained specific video materials.

112.    Triller did not inform users of its pattern and practice of disclosing personally identifiable information and does not obtain their consent to such disclosure.

113.    Unlawful disclosure of personally identifiable information concerning Plaintiff and Class members was not incident to the "ordinary course of business" of delivering the visual content as that term is defined by the VPPA. *See* 18 U.S.C. § 2710(a)(2). The disclosure of users' personally identifiable information to third parties not involved in the transactions as alleged herein was not necessary in order for Triller to deliver those prerecorded visual materials to Plaintiff and the other Class members.

114.    The VPPA also provides that a videotape service provider may nonetheless disclose personally identifiable information concerning a consumer as long as that person has provided "informed written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

115.    Triller, however, failed to obtain the "informed, written consent" of Plaintiff and the other Class members "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is soon." See 18 U.S.C. § 2710(b)(2)(B)(i)-(ii). No Triller document complied with these requirements.

116.    The VPPA also requires that "[a] person subject to the section shall destroy personally identifiable information as soon as practicable, but no later than one year from the date the information is no longer necessary for the purposes for which it was collected . . . ." 18 U.S.C. § 2710(e).

117.    Upon information and belief, Triller does not destroy this information and maintains users' personally identifiable information, despite the fact that it is no longer necessary for purposes of delivering the prerecorded visual information, in violation of the VPPA.

118.    Plaintiff, individually and on behalf of the other Class members, seeks to recover awarded actual damages, not less than liquidated damages in the amount of $2,500 per violation, punitive damages, attorneys' fees and costs, and such other preliminary and equitable relief as the Court determines to be appropriate.

### THIRD CLAIM FOR RELIEF

### *QUANTUM MERUIT* TO RECOVER SUMS HAD BY UNJUST ENRICHMENT

### (On Behalf of Plaintiff, the Nationwide Class, and, in the alternative, Subclasses)

119.    Plaintiff, individually and on behalf of the other Class members, repeats and reallege Paragraphs 1 through 95, as if fully alleged herein .

120.    Plaintiff brings this count to pursue restitution based on Triller's unjust enrichment, including by way of Triller's retention of profits that should have been expended to protect Plaintiff's and the other Class members' data as required by law.

121.    Triller has unjustly received and retained monetary benefit from Plaintiff and the other Class members—*i.e.*, by way of their use of, and profiting from, their data under unjust circumstances, such that inequity has resulted.

122.    By engaging in the conduct described in this complaint, Triller knowingly obtained benefits from Plaintiff and the other Class members as alleged herein under circumstances such that it would be inequitable and unjust for Triller to retain them.

123.    Triller will be unjustly enriched if permitted to retain the benefits derived from unlawful gathering and sharing of Plaintiff's and Class members' data.

124.    Plaintiff is therefore entitled to restitution in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by Triller by means of the above-

described actions, or as the circumstances may merit to provide complete relief to Plaintiff and Class members.

## STATE SUBCLASS CAUSES OF ACTION

### FOURTH CLAIM FOR RELIEF

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT,

### 815 ILCS §§ 505, *et seq.*

#### (On Behalf of Plaintiff Wilson and the Illinois Subclass)

125.    Plaintiff Wilson ("Plaintiff," for purposes of this claim) individually and on behalf of the other Illinois Subclass members, repeats and realleges Paragraphs 1 through 101, as if fully alleged herein.

126.    Plaintiff brings this claim under Illinois law, individually and on behalf of all other natural persons in the State of Illinois whose Private Information was collected and distributed without their consent by Triller through the App.

127.    Triller is a "person" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

128.    Plaintiff and the other Illinois Subclass members are "consumers" as defined by 815 Ill. Comp. Stat. §§ 505/1(e).

129.    Triller's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

130.    Triller's deceptive, unfair, and unlawful trade acts or practices, in violation of 815 Ill. Comp. Stat. § 505/2, include surreptitiously accessing, collecting, storing, and/or disclosing Plaintiff's and the other Illinois Subclass members' private information and data.

131.    Plaintiff and the other Illinois Subclass members were injured and have suffered damages as a direct and proximate result of Triller's unfair acts and practices.

132.    Plaintiff's and the other Illinois Subclass members' injuries were proximately caused by Triller's unfair and deceptive business practices.

133.    As a result of Triller's conduct, Triller has been unjustly enriched.

134.    Plaintiff, individually and on behalf of the other Illinois Subclass members, seeks all monetary and non-monetary relief allowed by law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests relief against Defendant as set forth below:

a.    Entry of an order certifying the proposed class and subclasses pursuant to Federal Rule of Civil Procedure 23;

b.    Entry of an order appointing Plaintiff as representative of the Class and Subclasses;

c.    Entry of an order appointing Plaintiff's counsel as Class Counsel for the class and subclasses;

d.    Entry of an order for injunctive and declaratory relief as described herein, including but not limited to:

   i.    Enjoining Triller, its affiliates, associates, officers, employees and agents from transmitting Triller user data;

   ii.    Enjoining Triller, its affiliates, associates, officers, employees and agents from taking Triller users' private draft videos (including any frames, digital images or other content from such videos) and biometric identifiers and information without advanced notice to, and the prior written consent of, such Triller users or their legally authorized representatives;

iii.      Enjoining Triller, its affiliates, associates, officers, employees and agents from taking physical/digital location tracking data, device ID data, personally identifiable data and any other Triller user data and content except that for which appropriate notice and consent is provided and which Triller can show to be reasonably necessary for the lawful operation of the Triller app within the United States;

iv.      Enjoining Triller, its affiliates, associates, officers, employees and agents from sharing Triller users' video viewing histories unless in compliance with the Video Privacy Protection Act;

v.      Mandating that Triller, its affiliates, associates, officers, employees and agents recall and destroy the Triller user data and content already taken in violation of law;

vi.      Mandating that Triller, its affiliates, associates, officers, employees and agents hire third-party monitors for a period of at least three years to ensure that all the above steps have been taken; and

vii.      Mandating that Triller, its affiliates, associates, officers, employees and agents provide written verifications on a quarterly basis to the court and counsel for the Plaintiff in the form of a declaration under oath that the above steps have been satisfied.

e.      Enter judgment in favor of Plaintiff and each of the other Class and Subclass members for damages suffered as a result of Triller's conduct alleged herein, including compensatory, statutory, and punitive damages; as well as equitable relief

including restitution and disgorgement, to include interest and prejudgment interest;

f.      Award Plaintiff her reasonable attorneys' fees and costs; and

g.      Grant such other and further legal and equitable relief as the court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 31, 2021                    Respectfully submitted,

                                            */s/ David A. Straite*
                                            David A. Straite
                                            **DiCELLO LEVITT GUTZLER LLC**
                                            One Grand Central Place
                                            60 East 42nd Street, Suite 2400
                                            New York, New York  10165
                                            Tel.: (646) 933-1000
                                            *dstraite@dicellolevitt.com*

                                            Adam J. Levitt
                                            Amy E. Keller (*pro hac vice* application to be submitted)
                                            James Ulwick (*pro hac vice* application to be submitted)
                                            **DiCELLO LEVITT GUTZLER LLC**
                                            Ten North Dearborn Street, Sixth Floor
                                            Chicago, Illinois  60602
                                            Tel.: (312) 214-7900
                                            *alevitt@dicellolevitt.com*
                                            *akeller@dicellolevitt.com*
                                            *julwick@dicellolevitt.com*

                                            Lesley E. Weaver (*pro hac vice* application to be submitted)
                                            Anne K. Davis (*pro hac vice* application to be submitted)
                                            Joshua D. Samra (*pro hac vice* application to be submitted)
                                            **BLEICHMAR FONTI & AULD LLP**
                                            555 12th Street, Suite 1600
                                            Oakland, California  94607
                                            Tel.: (415) 445-4003
                                            *lweaver@bfalaw.com*
                                            *adavis@bfalaw.com*
                                            *jsamra@bfalaw.com*

Javier Bleichmar
**BLEICHMAR FONTI & AULD LLP**
7 Times Square, 27th Floor
New York, New York  10036
Tel.: (212) 789-1340
*jbleichmar@bfalaw.com*

James J. Pizzirusso (*pro hac vice* application to be submitted)
**HAUSFELD LLP**
888 16th Street, NW, Suite 300
Washington, D.C.  20006
Tel.: (202) 540-7200
*jpizzirusso@hausfeld.com*

Steven M. Nathan
**HAUSFELD LLP**
33 Whitehall St., 14th Floor
New York, New York  10004
Tel: (646) 357-1100
*snathan@hausfeld.com*

***Counsel for Plaintiff and the Proposed Class and Subclasses***