**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| TAMARA WILSON, *individually and on behalf of all others similarly situated*, | |
| Plaintiff, | Case No.:  21-cv-11228-JSR |
| v. | **AMENDED CLASS ACTION COMPLAINT** |
| TRILLER, INC., a Delaware corporation, | |
| Defendant. | <u>DEMAND FOR JURY TRIAL</u> |

**Dated:**  May 16, 2022

Plaintiff TAMARA WILSON, individually and on behalf of all other similarly situated persons ("Plaintiff"), brings this class action against TRILLER, INC. ("Triller" or "Defendant"), and alleges as follows based on investigation of counsel and information and belief:

## NATURE OF THE CASE

1.     Defendant Triller maintains and operates a popular social media application ("Triller App" or the "App") that allows users to view, share, upload, and create short videos. Individuals who wish to upload videos to the platform in addition to viewing posts from other users must download the App and create an account.

2.     Unknown and undisclosed to users, Triller engages in a number of practices that violate various state consumer protection and privacy laws—including obtaining and storing video viewing information, and tracking and disclosing user watch histories without appropriate consent.

3.     This action seeks an order: (a) enjoining Triller from further unauthorized collection, storage, and use of certain of consumers' information; (b) declaring that Triller's conduct violates the Video Privacy Protection Act, and state consumer protection statutes; and (c) finding that Plaintiff and the Class members are entitled to all available damages, including statutory damages.

## PARTIES

**Plaintiff**

4.     Plaintiff **Tamara Wilson** is a citizen and resident of the State of Illinois.

5.     Plaintiff downloaded the Triller App onto her phone while she was in Illinois.

6.     Plaintiff was presented with a screen containing hyperlinks to Triller's Terms of Service and Privacy Policy in Illinois.

7.     Plaintiff created a Triller account while she was in Illinois.

8. Plaintiff provided all required information to Triller when creating her Triller account.

9. The personal information Plaintiff provided to Triller included her name, date of birth, email address, and phone number.

10. To the best of Plaintiff's recollection she also provided her home address to Triller, but does not recall for certain.

11. Plaintiff's Triller profile page contained her handle and her picture. Plaintiff's Triller handle included her actual name as part of the handle.

12. Plaintiff logged into her account and used the App for approximately one hour per day from approximately June 2020 through February 2021. Plaintiff always used the App in Illinois.

13. Plaintiff no longer has the Triller App on her phone.

14. Plaintiff, to the best of her recollection, did not upload or post any videos using the Triller App.

15. Plaintiff viewed and "liked" other user's videos, commented on videos, and sent messages to other viewers concerning their videos. Plaintiff took all of the foregoing actions while she was in Illinois.

**Defendant**[1]

16. Defendant **Triller, Inc.** ("Triller") is a Delaware corporation with its headquarters in Los Angeles, California and offices in Los Angeles, New York City, Orlando, Paris, London, and Faro. Triller is registered to do business in California and New York.

---

[1] Plaintiff may add additional defendants after additional discovery further demonstrates its connection to the allegations set forth herein.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to the Class Action Fairness

Act, 28 U.S.C. § 1332, because: (a) this is a proposed class action in which there are at least 100

Class members; (b) the parties are minimally diverse, as Plaintiff and Defendant are domiciled in

different states; and (c) the combined claims of Class members exceed $5,000,000, exclusive of

interest, attorneys' fees, and costs.

18.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff

brings a claim pursuant to federal law, the Video Privacy Protect Act, as alleged herein.

19.     This Court has personal jurisdiction over Triller because Triller regularly conducts

business throughout New York and has offices in New York.

20.     Venue is also appropriate in this District because Triller's Terms of Service provide

that all actions must be brought in either state or federal court in New York.

## COMMON FACTUAL ALLEGATIONS

### A.     Overview of the Triller App

21.     Triller is a video sharing social media network which was launched in 2015 by co-

founders David Leiberman and Sammy Rubin. In its original iteration, the App allowed users to

create and share their own music video creations. The App currently allows users to create videos

of no more than fifteen seconds in length, and synchronize those videos with Triller's library of

music, creating short music videos.

22.     Users can select background music from Triller's library of music, edit the

background music to choose what portions of the song to use in the videos, record a 15-second

video, edit the video or add filters, and then upload the finished video to share with others on the

Triller platform or on other social media platforms. Once uploaded, Triller allows users to

download or share videos with others, which Triller claims "democratizes the music video creation process," letting users create their own high-quality music videos to share elsewhere.

23.     In 2016, Triller expanded the success of its App by building out its social networking services, allowing users to follow each other and share their videos publicly. In this vein, Triller has positioned itself as a major competitor with other video-based social media platforms, such as TikTok.

24.     More specifically, Triller allows users to share their videos with other users designated as "friends" and then edit them together before sharing on the Triller App. The Triller App also provides a feed of recommended videos for each user based on the user's previous follows, views, and comments on the App.

25.     The Triller App also offers a "Discovery" feature that allows users to search for and listen to different songs that are featured or trendy, or search for specific songs or users.

26.     A Triller user does not need to have a Triller account to watch content on the platform.  A Triller user does need to have a Triller account to get full access to the platform, including the ability to follow other Triller creators, like and comment on videos, search for videos to watch, and record and share videos.

27.     Triller has grown through a mixture of angel investment and venture capital infusion, including from Triller's current controlling shareholder, Proxima Media, LLC.

28.     In November 2020, Triller expanded again to cover the sports promotion and distribution of pay-per-view events, such as the boxing match between Mike Tyson and Roy Jones, Jr.  Users could watch this video content through the Triller App.

29.     In February 2021, Triller launched TrillerTV, which makes 30 minute "live shows" available to Triller account holders through the Triller App.[2]  TrillerTV show hosts include Jennifer Lopez, DJ Khaled, 2 Chainz, Perez Hilton, JR Smith, and other popular celebrities.

30.     Triller now boasts over 350 million users worldwide.[3]   Based upon recent valuations that were performed in accordance with merger discussions, Triller's value is approximately $5 billion.[4]

31.     Triller sports a visually appealing, intuitive user interface ("UI"), using vibrant colors and small, intricate gifs to keep the user engaged throughout the entire experience. As a social media platform, the UI is particularly attractive to teens and young adults, Triller's target demographic.

32.     According to Proxima Media, LLC, Triller's controlling shareholder, the Triller App's largest demographic is made up of those aged 16-27 in the United States.

33.     Upon launching the App, Triller offers the user several different "page" options through its simplified UI. The options provided to a user who is not signed in are "Following," "Trills," "For You," "Activity", and a button to record a video. In addition, a user who is not signed in is presented with "Home," "Search," "Create," "Discovery," and "Profile" buttons. Of these, the "Record," "Following," "Activity," and "Profile," buttons will take the user to a page where they are invited to either sign in or register with Triller by creating a new account.

---

[2] Triller Launches Linear TV, A-List Lineup (Feb. 12, 2021), https://money.yahoo.com/triller-launches-linear-tv-list-154000553.html.

[3] Echo Wang, Triller owner in merger talks to go public—source, Reuters (Dec. 13, 2021), https://www.nasdaq.com/articles/triller-owner-in-merger-talks-to-go-public-source.

[4] Aisha Malik, TikTok rival Triller to go public via merger with SeaChange International, Tech Crunch (Dec. 22, 2021), https://techcrunch.com/2021/12/22/tiktok-rival-triller-to-go-public-via-merger-with-seachange-international/.

34.     Once signed in, each of the above buttons becomes accessible. "Following" provides a list of accounts that a user can parse through and select to follow and will also gather "Trills" created by creators that the user follows.

35.     "Trills" provides "Trills" recorded by famous, well-followed, or otherwise noteworthy accounts in an effort to engage users and to provide users with new accounts to follow.

36.     "For You" provides an algorithmically driven set of Trills that Defendant has curated that they believe will meet a user's taste and interest the user based upon the users "likes" of prior videos. The vast bulk of those videos are likely from people the user does not know, collated by the App's algorithm.

37.     Triller's algorithm is designed to ensure that users see videos and content that they like. This algorithm also allows advertisers to design and optimize ad campaigns to users that are more likely to click on them.

38.     To post, comment, or like videos, or to watch TrillerTV, users must create a Triller account.[5] When creating an account, users are prompted with a welcome screen showing the various ways to sign up for an account.  This screen is shown on the following page:

---

[5] Users do not need to sign up for an account to watch publicly accessible short videos on Triller.



39.     If the user clicks "Create a new account", they are prompted with another screen requesting that they enter their email address, username, and password.

40.     Users can register for a Triller account directly on the App.  Users can also register for a Triller account by using their Facebook, Instagram, or other social-media plug in credentials which Triller has integrated into the App.

41.     Triller limits users to "one (1) unique Account," and requires users to "agree to create only one (1) unique Account and that you shall be the sole authorized user of your Account."[6] Thus, as required by Triller as a condition of use of the App, every Triller account

---

[6] Triller Terms of Service, effective date December 17, 2020, Doc. 35-2.

belongs to a single, unique individual and only that individual.

42.     When creating a new account, users are "asked to submit" to Triller certain "Registration Data" including their "name, email address, phone number, birthday, profile name, picture, etc. and to create an Account login password."[7]

43.     Users must provide Triller with all Registration Data specifically required by Triller, including additional data Triller requests after a user initially creates their Account.

44.     Each profile name (also referred to as a "handle") on Triller is unique, with each handle assigned solely to and belonging solely to a specific individual user.

45.     Triller users often include their full name or part of their name in their Triller handle.

46.     A user's handle is always visible on their Profile page.  Each Profile page also has an About Me section where users can include additional information about themselves.  Users can also include a photo of themselves or an avatar on their Profile page.

47.     While public information regarding the reach of the Triller App varies, as of October of 2020, Ryan Kavanaugh of Proxima Media, LLC, Triller's majority shareholder, boasted that Triller "is up to 231 million downloads worldwide and has 65 million active monthly users."[8]

48.     Triller saw a jump in popularity after the Trump Administration publicly proposed banning TikTok from American mobile app stores because of its ties to the Chinese government.

---

[7] Triller Terms of Service, effective date December 17, 2020, Doc. 35-2.

[8] Trump, Triller, and the return of Ryan Kavanaugh, FastCompany (Oct. 15, 2020),https://www.fastcompany.com/90563686/trump-triller-and-the-return-of-ryan-kavanaugh.

For the first time, in August of 2020, Triller overtook TikTok in Apple's App Store, claiming the top spot in Free Apps in 85 countries, including the United States.[9]

**B.     Triller Automatically Transfers Users' Personally Identifiable Information to at Least Two Corporate Affiliates**

49.     Unbeknownst to users, Triller transfers users' personally identifiable video viewing information to Triller's corporate affiliates, Facebook and Appsflyer.

50.     Triller assigns certain unique identifiers to each user, including (but not limited to) a "handle," or name that the user picks for themselves, a unique number ("UID" or "user_id") that corresponds in Triller's internal databases to that handle (collectively referred to herein as "Unique Identifiers").

51.     These Unique Identifiers are associated only with one user account and are persistent across devices.

52.     Because Triller limits each user to a single user account, each set of Unique Identifiers assigned by Triller correspond to, and identify, a specific individual and only that individual.

53.     In addition, each unique device used to access the Triller App is assigned a unique "advertiser_id."

54.     Triller transmits the UID and advertiser_id to Facebook and Appsflyer, along with other personal information while a user is logged on to the platform.  Triller designed the App to transmit this information directly from the user's device.

---

[9] Andrea Bossi, Triller Overtakes TikTok, Jumps to No. 1 in App Store as Drama Continues, Forbes (Aug. 3, 2020), https://www.forbes.com/sites/andreabossi/2020/08/03/triller-jumps-to-no-1-on-the-app-store-overtakes-tiktok-as-drama-continues/?sh=a4abb766d4aa.

55.     When a user logs on to the Triller App, the state the user is located in at the time they log on to the App is the state from which Triller transmits the UID, advertiser_id, and other personal information.  For example, if a user logs on to the Triller App while the user is located in Illinois, Triller transmits the UID, advertiser_id, and user's other personal information from Illinois to Facebook and Appsflyer, wherever their specified domains are located.

56.     When a user visits her profile page, Triller pairs the UID and handle with other data from the user's profile page including (but not limited to) anything written in the "About Me" section, the URL of the photo chosen by the user for use as an avatar (a photographic representation of the user) on the App, whether or not the user has a linked Instagram account (and, if so, the linked Instagram handle), whether or not the user has listed a Soundcloud URL or linked Snapchat account, and any photos or videos viewed and/or liked by the user on her profile.

57.     Further, when a user watches a video in the App, in addition to the UID, advertiser_id, and other user personal information sent to Facebook and Appsflyer, an event indicating the video ID and the creator handle is created and sent to both Facebook and Appsflyer, regardless of whether or not the user watching the video has connected a Facebook (or any other social media) account to Triller.

58.     For example, if a user watches a video by creator "charlidamelio," a portion of the data sent to Facebook contains the following string:

> "video_user_name":"charlidamelio","position":"0","muted":"true",
>
> "video_id":"64266234"

59.     For data sent to Appsflyer, the same traffic has:

> "video_user_name\":\"charlidamelio\",\"position\":0,\"muted\":true
>
> ,\"video_id\":64266234}

60.     With the username of the creator (in this example, "charlidamelio") and the "video_id" number (in this example, "64266234"), which are sent by Triller to its corporate affiliates anytime the user watches that video, those corporate affiliates (or anyone else) can find the videos watched by simply entering the data into a simple URL format, e.g.: "https://triller.co/@charlidamelio/video/64266234."

61.     Generically, this format is consistent across the website; as long as an entity has a creator handle and a video ID number, that entity can identify exactly what video was watched by the user. The generic URL anyone can use to obtain this information is: https://triller.co/@(handle)/video/(video_id).

62.     Triller couples together a user's UID with the video-id and the creator's handle to create a package of data which is then sent to Facebook and Appsflyer.

      a.   When sent to Facebook, the data is sent to the domain "graph.facebook.com."

      b.   When sent to Appsflyer, the data is sent to the domain "inapps.appsflyer.com."

63.     This data is sent to Triller's corporate affiliates every time a video is viewed by a user, regardless of where the video is viewed on the App.

64.     For example, when the user likes a video by the video poster "lexijayde", Triller transmits the following information to one of its corporate affiliates:

{"_eventName":"social_liked_video","_eventName_md5":"c432d71b7e7b6fb006 cf231d48e8ec61","_logTime":1616796579,"_ui":"unknown","_session_id":"e3e9 a1c0-852e-4c75-a94e- ec8235172d8f","country_code":"US","triller_session_id":"fef4838a-b841-  4d09- af3a- a013c729049b","user_id":"438861246","feed_position":"18","video_user_name":

"lexijayde","language":"English","version_info":"v24.1b7","position":"18","video_user_id":"14480127","video_id":"63163294"}

65.     This data indicates the fact that the user liked a given video, and includes:

    a.    The user's unique UID (e.g. "438861246");

    b.    The video poster's account name, or "handle" (e.g.; "lexijayde");

    c.    The video poster's unique UID (e.g.: "14480127"); and

    d.    The unique identifier for the video itself, or "video_id" (e.g.: "63163294").

66.     The information transmitted to these domains also includes the region where the user resides by country (*e.g.* U.S.), time-zone of the user, and the user's device information.

67.     Triller associates the same UID to an individual user when it shares information to Facebook and Appsflyer. When a user logs on to Triller from a new device, Triller assigns a unique "advertiser_id" to the device, while still associating the same UID to that individual user. So regardless of the device used to log on to the Triller App, Triller associates the same UID with the user and her App activity.

68.     Even after a user has cleared her browser history and cleared her cookies, the Triller App will continue pairing the same UID with the video viewing information it transmits to Facebook and Appsflyer while the user is logged on. The additional Unique Identifiers that Triller transmits allow Facebook and Appsflyer to continue identifying a user's viewing activity even when the user is no longer logged on but is still viewing videos on the platform.

69.     As the user navigates through videos on Triller's platform, Triller continues to transfer user's personally identifying video viewing history to Facebook and Appsflyer.

70.     For instance, Facebook creates custom events, which collect detailed information about interactions with the App, including:

    a.  when a video is loaded (video_view)

    b.  when a video plays (video_watched)

    c.  when a video is liked (social_liked_video)

    d.  when another user is visited (social_view_profile)

71.    In addition, these events are time-stamped, so the time that a user spends watching each video is recorded.

72.    The identity of the video maker and the video identifier are also recorded for each Facebook event.

73.    Once Facebook or Appsflyer has an UID, they can find the handle associated with the UID simply by entering the data into a simple URL format, e.g.: https://social.triller.co/v1.5/api/users/456747106.  If you enter the foregoing URL, you receive the following results:

{"user": {"user_id": 456747106, "username": "jakegoto", "name": "Jake gotomachiku", "private": false, "verified_user": false, "avatar_url": "https://uploads.cdn.triller.co/v1/avatars/456747106/1619567584_avatar_2021-04-27-16-51-58.jpg", "profile_cover_url": null, "dm_registered": true, "storefront_url": null, "creator_status": false, "contributor_status": false, "user_uuid": "c5c4f936-68ef-4775-bae3-48ac912c257d", "about_me": "music is in da club", "auto_confirmed": false, "instagram_handle": null, "instagram_verified": false, "soundcloud_url": null, "button_text": null, "button_text_color": null, "button_background_color": null, "button_url": null, "follower_count": 1, "followed_count": 0, "verified": true, "failed_age_validation": false, "has_snaps": false, "buttons": {}, "profile_type": "public"}, "status": true}

74.     This data indicates to Facebook, Appsflyer, or any other entity viewing the data that user_id 456747106 is the individual whose Triller handle is jakegoto, and that jakegoto's profile page also includes the name the user provided on their profile page – Jake gotomachiku.

75.     Generically, this format is consistent across the website. The generic URL one can enter to obtain this information is: https://social.triller.co/v1.5/api/users/(user_id).

76.     Because a Triller UID is unique to the user it is assigned to, a Triller UID is personally identifiable information.

77.     Because a Triller handle is also unique to the user it is assigned to, a Triller handle is personally identifiable information.

78.     Once Facebook or Appsflyer uses the UID to get the user's handle, they can also go to the user's profile page and view any other personal information on that page, including their given name and picture if the user has included that information.

79.     For example, Plaintiff's given name and picture are on her profile page, and her handle also includes her name.  So with the unique UID Triller assigned to Plaintiff, and little to no effort, Facebook and Appsflyer can readily identify Plaintiff as the person whose video watch history Triller disclosed to them as associated with her unique UID.

80.     Similarly, if you have a user's handle, you can find the UID Triller has assigned to that user by, e.g., going to https://triller.co/@jakegoto and looking at the network traffic, which will automatically load: https://social.triller.co/v1.5/api/users/456747106.  This format is also consistent across the website.   Entering https://triller.co/@(handle) will automatically load https://social/triller.co/v1.5/api/users/(user_id), which is readily visible in the network traffic.

81.     Upon information and belief, Triller is aware that Facebook and Appsflyer can easily associate an individual's UID with that individual.  Accordingly, the information that Triller

shares with Appsflyer and Facebook is information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider.

82.   Upon information and belief, Triller is aware that anyone can easily associate an individual's UID with that individual, for example, through using the URL format discussed above.   Accordingly, the information that Triller shares with Appsflyer and Facebook is the type of information that would readily permit an ordinary person, with little or no extra effort, to identify a specific person as having requested or obtained specific video materials or services from a video tape service provider.

### C.   Triller Collects and Discloses Data Without Informing or Obtaining Consent from Users, in Violation of the Video Privacy Protection Act

83.   Triller violates the Video Privacy Protection Act ("VPPA") by maintaining and disclosing data, without informing Plaintiff and without obtaining the consent of Plaintiff, in violation of 18 U.S.C. at § 2710.

84.   Triller is a "video tape service provider" ("VTSP") under 18 U.S.C. § 2710(a)(4) because Triller regularly delivers video content to users and maintains a cache of videos and virtual materials, including content from users, verified users, and advertisers.

85.   Plaintiff and Class members are "consumers" under the VPPA because they are "subscriber[s] of goods or services" from Triller. 18 U.S.C. § 2710(a)(1).

86.   Plaintiff and Class members provided personally identifiable information to Triller in order to sign up, become registered users, establish user profiles, and engage in Triller's video streaming content and services.

87.   The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall

be liable to the aggrieved person for the relief" provided for under the statute. 18 U.S.C. § 2710 (b)(1).

88.     Triller violates the VPPA by knowingly disclosing to third parties, including Facebook and Appsflyer, users' personally identifiable information including, but not limited to, each user's unique handle and UID (which is persistent across different devices), identifier information about what videos users played, how long they are played, time stamps at which a video is paused and/or stopped, videos users liked, and when a user has visited the profile of another user. *See* 18 U.S.C. § 2710(a)(1)(3) (defining "personally identifiable information" to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider[.]").  This information is specific enough to identify individual consumers.[10]

89.     The VPPA does allow a VTSP to disclose personally identifiable information so long as the VTSP obtains the "informed, written consent" of the consumer, which requires the: (a) disclosure be "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer"; (b) "made at the election of the consumer" either "at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner"; and (c) the VTSP has provided an "opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(b)(2)(B).

---

[10]  Big Data May Not Know Your Name.  But It Knows Everything Else, Wired, https://www.wired.com/story/big-data-may-not-know-your-name-but-it-knows-everything-else/.

90.     Triller does not provide distinct and separate disclosure regarding users' video watch history or other gathered video-watching data, nor does it require written consent distinct from other forms of consent or obligations either at the time Triller sought to disclose users' video viewing histories or in advance of sharing those viewing histories for a set duration of time. Triller also does not allow for users to withdraw from ongoing disclosures of their personally identifiable information, as required by the VPPA.

91.     Triller's Privacy Policy states that it "may use third parties to outsource one or more aspects of our business and/or Platform operations (including, but not limited to, email or customer service functions, data processing, web analytics, maintenance, online advertising, certain augmented reality functionalities, certain social media plug-in integrations, and security execution and clearing services)," and may provide User "Personal Information" to such third parties in connection with the performance of such activities.[11] Triller's Privacy Policy also states that it may disclose to "network advertisers, ad agencies, analytics service providers, and other vendors" certain information about "pages viewed, content interacted with, and actions taken by Users when visiting the Platform" so that it may "serve advertisements on other web sites, within mobile apps and elsewhere online; and to provide [Triller] with information regarding the use of the Platform and the effectiveness of our advertisements and other marketing campaigns."[12] But these disclosures do not meet the requirements of the VPPA, because the disclosures are not made in a separate and distinct policy—rather they are buried within Triller's Privacy Policy—and do not set out the length of time that information will be disclosed. Thus, Triller did not obtain "informed, written consent" as required by the VPPA.

---

[11] Triller Privacy Policy, effective Dec. 17, 2020, Doc. 35-1.

[12] *Id.*

92.     As a result, each Triller App user is required to provide, at the very least, certain kinds and types of data to Triller in exchange for the ability to use the App under the Platform License.

93.     Absent from this bargained-for exchange, however, is Triller taking users' personally identifiable data, including their video watch histories, and disclosing that information to third parties without the requisite consent in violation of the VPPA; or Triller disclosing users' personally identifiable information to entities other than those specifically identified in Triller's Privacy Policy or for purposes beyond those specifically identified in Triller's Privacy Policy.

94.     Triller does not disclose in its Privacy Policy or elsewhere that it is disclosing user's personally identifiable information to Facebook or Appsflyer.

95.     Upon information and belief, Triller is not disclosing user's personally identifiable information to Facebook or Appsflyer for any of the purposes set forth in Section 5 of the Privacy Policy, "Use of Information We Collect."

96.     Upon information and belief, Triller is disclosing user's personally identifiable information and other personal data to third parties, including Facebook and Appsflyer, beyond the reasons necessary to fulfill the purposes set forth in Section 5 of the Privacy Policy, "Use of Information We Collect."

97.     Upon information and belief, Triller is not disclosing user's personally identifiable information and other personal data to Facebook or Appsflyer for any of the purposes set forth in Section 8 of the Privacy Policy, "Sharing Your Information," subsection "Information We May Share with Third Parties."

98.     Upon information and belief, Triller is disclosing user's personally identifiable information and other personal data to third parties, including Facebook and Appsflyer, beyond

the reasons necessary to fulfill the purposes set forth in Section 8 of the Privacy Policy, "Sharing Your Information," subsection "Information We May Share with Third Parties."

99.     Triller's knowing disclosures of users' personally identifiable information and video watch histories to third parties, including Facebook and Appsflyer, without obtaining the consent required by the VPPA, is intentional.

100.    Triller's knowing disclosures of users' personally identifiable information and video watch histories to third parties, including Facebook and Appsflyer, without obtaining the consent required by the VPPA, is willful.

101.    By knowingly disclosing users' personally identifiable information and video watch histories to third parties, including Facebook and Appsflyer, without obtaining the consent required by the VPPA, Triller is engaging in conduct evincing a reckless disregard for its customer's rights.

102.    By knowingly disclosing users' personally identifiable information and video watch histories to third parties, including Facebook and Appsflyer, without obtaining the consent required by the VPPA, Triller is engaging in intentional misconduct or conduct which smacks of intentional misconduct.

103.    Triller's knowing disclosure of users' personal data to third parties, is intentional.

104.    Triller's knowing disclosure of users' personal data to third parties, is willful.

105.    By knowingly disclosing users' personal data to third parties in a manner inconsistent with the Privacy Policy, Triller is engaging in conduct evincing a reckless disregard for its customer's rights.

106.    By knowingly disclosing users' personal data to third parties in a manner inconsistent with the Privacy Policy, Triller is engaging in intentional misconduct or conduct which smacks of intentional misconduct.

**D.    The Triller App Is Not "Free"**

107.    When a user signs up for a Triller account, Triller agrees to provide the user with a "Platform License" to "access and make personal use of the Platform, the Platform Content … and User Content," for the user's "personal enjoyment, self-expression, and the possibility of public exposure."[13]

108.    In exchange for the grant of the Platform License, users "acknowledge and agree that Company [Triller] may generate revenues, increase goodwill, or otherwise increase the value of the Company, from your use of the Platform and any User Content you upload thereto," including "through the sale of advertising, sponsorships, promotions, and usage data."[14]

109.    Users' personally identifiable information also has intrinsic value and is a valuable commodity that can be monetized and was monetized by Triller.

**E.    Triller Obscures the Terms of Service and Privacy Policy**

110.    Triller makes no effort to ensure that users see the full text of its Terms of Service and Privacy Policy.  When downloading the App, there is no requirement that the user agree to any of the terms contained in the Terms of Service or the privacy provisions contained in the Privacy Policy.

---

[13] Triller Terms of Service, effective December 17, 2020, Doc. 35-2.

[14] *Id*.

111.    Indeed, to access the Privacy Policy or Terms of Service, a user must access the Profile Page, find a tiny gear in the top right of the screen, tap on that gear, then find the "Privacy Policy" and "Terms of Service" under the "Legal" section in the settings.

112.    There is no requirement that a user read or accept the disclosures in the Privacy Policy before using the App.

113.    Triller's designers have the ability to ensure that consumers read Triller's Terms of Service and Privacy Policy, but have elected not to do so.  For example, Triller designers require users to provide their birthday (meaning that 100% of users who complete the sign-up process must provide a date of birth, but not all users must have read the Terms of Service or Privacy Policy as there is no similar requirement).

114.    Requiring consumers to read and review terms of service with an explicit opt-in has been common practice in the design of end-user license agreements since the 1990s.

115.    By making the Terms of Service and Privacy Policy difficult to read, and by not requiring consumers to read those documents, Triller attempts to hide terms that purport to insulate them from lawsuits.[15]

116.    After the filing of this lawsuit, Triller abruptly changed its Terms of Service and Privacy Policy to insert language that would make it more difficult for consumers to pursue their rights in a court of law.  Triller changed their Terms of Service and Privacy Policy despite knowing that this class action had been filed, and did so without first informing Plaintiff or this Court.

---

[15] Such practices are known as "dark patterns" and are highly criticized as a "design that manipulates or heavily influences users to make certain choices."  Sara Morrison, *Dark patterns, the tricks websites use to make you say yes, explained*, Vox (Apr. 1, 2021), https://www.vox.com/recode/22351108/dark-patterns-ui-web-design-privacy.  *See also* Greg Bensinger, *Stopping the Manipulation Machines*, New York Times (Apr. 30, 2021), https://www.nytimes.com/2021/04/30/opinion/dark-pattern-internet-ecommerce-regulation.html (providing examples of "dark patterns" in website and mobile designs).

### F.    Fraudulent Concealment and Tolling

117.    All applicable statutes of limitation have been tolled by Triller's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.

118.    Instead of disclosing Triller's practice of collecting, storing, using, and disclosing users' personally identifiable information and video viewing information, Triller conceals this practice from users by not disclosing it to users or making this information otherwise available. Triller conceals this information to encourage users to download and use the App.

119.    Despite reasonable diligence on her part, Plaintiff remained ignorant of the factual bases for her claims for relief. Triller's withholding of material facts concealed the claims alleged herein and tolled all applicable statutes of limitation.

### CLASS ACTION ALLEGATIONS

120.    Plaintiff seeks certification of the Classes set forth herein pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"). Specifically, Plaintiff seeks class certification of all claims for relief herein on behalf of a Class, or, in the alternative Subclasses defined as follows:

a.    **Nationwide Class**: All persons who reside in the United States who used the Triller App; or, in the alternative:

b.    **Multistate Consumer Protection Class**: All persons who reside in Illinois or any state with materially similar consumer protection laws[16] who used the Triller App; and

---

[16] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include but are not limited to: Arkansas (Ark. Code § 4-88-101, *et seq.*); California (Cal. Bus. & Prof. C. §§ 17200 and 17500 *et seq.*); Colorado (Colo. Rev. Stat. § 6-1-101, *et seq.*); Connecticut (Conn. Gen. Stat. § 42-110, *et seq.*); Delaware

      c.   **Illinois Subclass**: All persons who reside in Illinois and used the Triller App to view and/or create one or more videos.

121.    Plaintiff is the proposed Class representative for the Class and Subclasses asserted herein.

122.    Plaintiff reserves the right to modify or refine the definitions of the Class and the Subclasses.

123.    Excluded from the Class and the Subclasses are: (a) any judge or magistrate judge presiding over this action and members of their staff, as well as members of their families; (b) Triller, Triller's predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which Triller or its parents have a controlling interest, as well as Triller's current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class or Subclasses; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Triller; and (f) the legal representatives, successors, and assigns of any such excluded persons.

---

(Del. Code tit. 6, § 2511, *et seq.*); District of Columbia (D.C. Code § 28-3901, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Hawaii (Haw. Rev. Stat. § 480-1, *et seq.*); Idaho (Idaho Code § 48-601, *et seq.*); Illinois (815 ICLS § 505/1, *et seq.*); Maine (Me. Rev. Stat. tit. 5 § 205-A, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); Montana (Mo. Code. § 30-14-101, *et seq.*); Nebraska (Neb. Rev. Stat. § 59 1601, *et seq.*); Nevada (Nev. Rev. Stat. § 598.0915, et seq,); New Hampshire (N.H. Rev. Stat. § 358-A:1, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New Mexico (N.M. Stat. § 57-12-1, *et seq.*); New York (N.Y. Gen. Bus. Law § 349, *et seq.*); North Dakota (N.D. Cent. Code § 51-15-01, *et seq.*); Oklahoma (Okla. Stat. tit. 15, § 751, *et seq.*); Oregon (Or. Rev. Stat. § 646.605, *et seq.*); Rhode Island (R.I. Gen. Laws § 6-13.1-1, *et seq.*); South Dakota (S.D. Code Laws § 37-24-1, *et seq.*); Texas (Tex. Bus. & Com. Code § 17.41, *et seq.*); Virginia (VA Code § 59.1-196, *et seq.*); Vermont (Vt. Stat. tit. 9, § 2451, *et seq.*); Washington (Wash. Rev. Code § 19.86.010, *et seq.*); West Virginia (W. Va. Code § 46A-6- 101, *et seq.*); and Wisconsin (Wis. Stat. § 100.18, *et seq.*). See Mullins v. Direct Digital, LLC, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), aff'd, 795 F.3d 654 (7th Cir. 2015).

124.     **Ascertainability.** The proposed Class and Subclasses are readily ascertainable because they are defined using objective criteria to allow Class and Subclass members to determine if they are part of the Class and/or the Subclasses. Further, the Class and Subclasses can be readily identified through records that Triller maintains.

125.     **Numerosity (Rule 23(a)(1)).** The Class and Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of Class and Subclass members, as herein identified and described, is not known, but download figures indicate that the Triller App has been downloaded more than 100 million times in the United States.

126.     **Commonality (Rule 23(a)(2)).** Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

    a.   Whether Triller engaged in the activities and practices referenced above;

    b.   Whether Triller's activities and practices referenced above constitute a violation of the Illinois Consumer Fraud Act, 815 ILCS §§ 505, *et seq*.;

    c.   Whether Triller's activities and practices referenced above constitute a violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*;

    d.   Whether Plaintiff and the other Class and Subclass members sustained damages as a result of Triller's activities and practices referenced above, and, if so, in what amount;

    e.   Whether Triller profited from their activities and practices referenced above, and, if so, in what amount;

    f.   What is the appropriate injunctive relief to ensure that Triller no longer unlawfully: (a) takes private and personally identifiable Triller user data and

content—including User/Device Identifiers and video viewing histories; (b) uses private and personally identifiable Triller user data and content to create consumer demand for and use of Triller's other products; (c) causes the diminution in value of Triller users' private and personally identifiable data and content; (d) causes Triller users to incur higher data usage and electricity charges; and (e) profiles and targets, based on the above activities, Triller users with advertisements.

g.  What is the appropriate injunctive relief to ensure that Triller takes reasonable measures to ensure that it and relevant third parties destroy unlawfully-acquired private and personally identifiable Triller user data and content in their possession, custody or control.

127.  **Typicality (Rule 23(a)(3)).** Plaintiff's claims are typical of the claims of the other Class and Subclass members' claims, because, among other things, Plaintiff and the other Class and Subclass members sustained similar injuries as a result of Triller's uniform wrongful conduct and their legal claims all arise from the same events and wrongful conduct by Triller.

128.  **Adequacy (Rule 23(a)(4)).** Plaintiff will fairly and adequately protect the interests of the other Class and Subclass members. Plaintiff's interests do not conflict with the interests of the other Class and Subclass members, and Plaintiff has retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Class and Subclasses.

129.  **Predominance & Superiority (Rule 23(b)(3)).** In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining this action as a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class and Subclass members, and a class action is superior to individual

litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to Plaintiff is insufficient to make litigation addressing Triller's conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

130.    **Final Declaratory or Injunctive Relief (Rule 23(b)(2)).** Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(b)(2). Triller has acted or refused to act on grounds that apply generally to the Class and Subclasses, making final declaratory and/or injunctive relief appropriate with respect to the Class and Subclasses as a whole.

131.    **Particular Issues (Rule 23(c)(4)).** Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class and Subclass members and are capable of class-wide resolution that will significantly advance the litigation.

**CAUSES OF ACTION**

**NATIONWIDE CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710,** *et seq.*
**(On Behalf of Plaintiff and the Nationwide Class)**

132.    Plaintiff, individually and on behalf of the other Class members, repeats and reallege Paragraphs 1 through 131, as if fully alleged herein.

133.    The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1). Defendant Triller violated this statute by knowingly disclosing Plaintiff's and other Class members' personally identifiable information to Facebook, Appsflyer, and other corporate affiliates.

134.    Defendant Triller is a "video tape service provider" under 18 U.S.C. § 2710(a)(4) because it "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." Triller is engaged in the business of delivering video content and services to its users, including Plaintiff and the other Class members. Triller's platform allows users to create, post, share, view, and otherwise engage with videos. Triller's platform is built to deliver video content to consumers. Triller regularly delivers videos to Triller's subscribers, including Plaintiff and the other Class members, by making those materials electronically available to Plaintiff and the other Class members on Triller's platform. Triller also allowed users to create and share videos with a non-public audience.

135.    Plaintiff and the other Class members are "consumers" under 18 U.S.C. § 2710(a)(1) because they are "subscriber[s] of goods or services" from Triller. Plaintiff and the other Class members are registered Triller users who use the website and mobile application through interaction with it. Plaintiff and the other Class members were required to provide personally identifiable information to Triller, including their name, email address, and date of birth, in order to sign up, become registered users, establish user profiles, to subscribe to "follow" other accounts, and to contribute to Triller's video streaming content. By signing up for accounts with Triller, becoming registered users, establishing user profiles, providing Triller with personally

identifiable information, and spending time and attention using and contributing to Triller's video streaming platform, Plaintiff and the other Class members entered into transactions with Triller to obtain access to Triller's content and services and for the purpose of subscribing to Triller's video streaming content and services.

136.    The VPPA defines "personally identifiable information" to "include[] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(1)(3). Triller "knowingly disclose[d]" to corporate affiliates users' personally identifiable information, including what videos a user has watched; whether a user has engaged with videos by downloading, liking, commenting and/or sharing the video; how long the user views the video; whether the user saves the video to their "Favorites" page; and accounts the user follows. Triller's disclosure also included personally identifiable information because the information shared included a user's: UID, username, device information, and location data.

137.    Defendant Triller disclosed personally identifiable information to corporate affiliates Facebook and Appsflyer, through the transfer of data to at least the following domains: "graph.facebook.com.", and "inapps.appsflyer.com."

138.    Every time a user visits the platform, Triller transfers to its corporate affiliates through their selected domains: the advertiser_id, which is unique to each device a user uses to log on to the Triller App; the user_id, which corresponds to the unique profile name (aka "handle") chosen by the user; the user_id of the creator of the video watched; the video_id of the video watched; the duration that the user watched the video for; and the time the user watched it. Triller also creates a unique "session_id" which groups together all videos watched, liked, shared, or

otherwise interacted with by a user during a viewing session on Triller into a single identifiable event.

139.    Triller maintains the same UID for each individual user. While a user is logged on to the platform, Triller pairs the same UID with the video viewing information for that user which Triller transmits to its corporate affiliates. This UID follows the user every time she logs on to the platform regardless of the device used. The additional Unique Identifiers that Triller transmits to its corporate affiliates allow them to continue identifying users' viewing activity. When a user visits her profile page, these Unique Identifiers are easily linked to the user's handle, and profile page. The user's profile page contains information that can further identify individuals by name since it includes an uploaded biography and videos that the user has shared.

140.    The information Triller provides to Facebook and Appsflyer enables them to easily identify individuals and their video watch history.

141.    Triller's pairing of personal information, including a user's handle and Unique Identifiers, with users' video viewing history violates the VPPA because it readily shows which users requested or obtained specific video materials.

142.    Triller did not and does not inform users of its pattern and practice of disclosing personally identifiable information and did not and does not obtain their informed, written consent to such disclosure.

143.    Unlawful disclosure of personally identifiable information concerning Plaintiff and Class members was not incident to the "ordinary course of business" of delivering the visual content as that term is defined by the VPPA. *See* 18 U.S.C. § 2710(a)(2). The disclosure of users' personally identifiable information to third parties not involved in the transactions as alleged herein

was not necessary in order for Triller to deliver those prerecorded visual materials to Plaintiff and the other Class members.

144.    The VPPA also provides that a videotape service provider may nonetheless disclose personally identifiable information concerning a consumer as long as that person has provided "informed written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

145.    Triller, however, failed to obtain the "informed, written consent" from Plaintiff and the other Class members "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is soon." See 18 U.S.C. § 2710(b)(2)(B)(i)-(ii). No Triller document complied with these requirements.

146.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

147.    Plaintiff, individually and on behalf of the other Class members, seeks to recover awarded actual damages, not less than liquidated damages in the amount of $2,500 per violation, punitive damages, attorneys' fees and costs, and such other preliminary and equitable relief as the Court determines to be appropriate.  Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages

in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## STATE SUBCLASS CAUSES OF ACTION
### SECOND CLAIM FOR RELIEF
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT,
### 815 ILCS §§ 505, *et seq.*
### (On Behalf of Plaintiff Wilson and the Multistate Consumer Protection Class, or, alternatively, the Illinois Subclass)

148.    Plaintiff individually and on behalf of the other Multistate Consumer Protection Class and Illinois Subclass members, repeats and realleges Paragraphs 1 through 131, as if fully alleged herein.

149.    Plaintiff brings this claim under Illinois law, individually and on behalf of all other natural persons in the State of Illinois whose Private Information was collected and distributed without their consent by Triller through the App.

150.    Plaintiff additionally brings this claim on behalf of all other natural persons in States with materially similar consumer protection laws to the consumer protection laws in Illinois.

151.    Triller is a "person" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

152.    Plaintiff, the other Illinois Subclass members, and the Multistate Consumer Protection Class members are "consumers" as defined by 815 Ill. Comp. Stat. §§ 505/1(e).

153.    Plaintiff's, the other Illinois Subclass members', and the Multistate Consumer Protection Class members' actions in downloading the Triller App and signing up for Triller accounts were equivalent to making a "purchase" from Triller because they used the services of a commercial entity – Triller, and that commercial entity, in exchange, gathered and monetized their data, including personally identifiable information, without their consent.

154.    Triller's unfair business practices were targeted at all Triller App users, including Plaintiff, the other Illinois Subclass members, and the Multistate Consumer Protection Class members.

155.    Triller's surreptitious collection and disclosure of Plaintiff's, the other Illinois Subclass members', and the Multistate Consumer Protection Class members' data, including their personally identifiable information, involves important consumer protection concerns.

156.    The relief requested by Plaintiff, the other Illinois Subclass members, and the Multistate Consumer Protection Class members, would provide redress for the harms Triller caused not just to Plaintiff, but to all other Illinois Subclass members, and the Multistate Consumer Protection Class members.

157.    Triller's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

158.    Triller's deceptive, unfair, and unlawful trade acts or practices, in violation of 815 Ill. Comp. Stat. § 505/2, include surreptitiously accessing, collecting, storing, and/or disclosing Plaintiff's, the other Illinois Subclass members', and the Multistate Consumer Protection Class members' private information and data.

159.    Triller's unfair acts and practices against Plaintiff and the other members of the Illinois Subclass occurred in the course of trade or commerce in Illinois, arose out of transactions that occurred in Illinois, and/or harmed individuals in Illinois.

160.    Triller's unfair acts and practices against the Multistate Consumer Protection Class members occurred in the course of trade or commerce in, arose out of transactions that occurred in, and or harmed individuals in each subclass member's home state.

161.    Plaintiff, the other Illinois Subclass members, and the Multistate Consumer Protection Class members were injured and have suffered damages as a direct and proximate result of Triller's unfair acts and practices.

162.    Plaintiff's, the other Illinois Subclass members', and the Multistate Consumer Protection Class members' injuries were proximately caused by Triller's unfair and deceptive business practices.

163.    As a result of Triller's conduct, Triller has been unjustly enriched.

164.    Because of the similarity between the consumer protection laws in Illinois and those in the home states of the Multistate Consumer Protection Class members, Triller's unfair and deceptive conduct also violates the consumer protection laws of the home states of the Multistate Consumer Protection Class members.

165.    Plaintiff, individually, on behalf of the other Illinois Subclass members, and on behalf of the Multistate Consumer Protection Class members, seeks all monetary and non-monetary relief allowed by law.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Nationwide Class members, the Multistate Consumer Protection Class members, and the Illinois Subclass members, respectfully requests relief against Defendant as set forth below:

a.      Entry of an order certifying the proposed Class and Subclasses pursuant to Federal Rule of Civil Procedure 23;

b.      Entry of an order appointing Plaintiff as representative of the Class and Subclasses;

c.      Entry of an order appointing Plaintiff's counsel as Class Counsel for the Class and Subclasses;

d.    Entry of an order for injunctive and declaratory relief as described herein, including but not limited to:

    i.    Enjoining Triller, its affiliates, associates, officers, employees and agents from transmitting Triller user data;

    ii.    Enjoining Triller, its affiliates, associates, officers, employees and agents from taking physical/digital location tracking data, device ID data, personally identifiable data and any other Triller user data and content except that for which appropriate notice and consent is provided and which Triller can show to be reasonably necessary for the lawful operation of the Triller App within the United States;

    iii.    Enjoining Triller, its affiliates, associates, officers, employees and agents from sharing Triller users' video viewing histories unless in compliance with the Video Privacy Protection Act;

    iv.    Mandating that Triller, its affiliates, associates, officers, employees and agents recall and destroy the Triller user data and content already taken in violation of law;

    v.    Mandating that Triller, its affiliates, associates, officers, employees and agents hire third-party monitors for a period of at least three years to ensure that all the above steps have been taken; and

    vi.    Mandating that Triller, its affiliates, associates, officers, employees and agents provide written verifications on a quarterly basis to the court and counsel for the Plaintiff in the form of a declaration under oath that the above steps have been satisfied.

e.   Enter judgment in favor of Plaintiff and each of the other Class and Subclass members for damages suffered as a result of Triller's conduct alleged herein, including compensatory, statutory, and punitive damages; as well as equitable relief including restitution and disgorgement, to include interest and prejudgment interest;

f.   Award Plaintiff her reasonable attorneys' fees and costs; and

g.   Grant such other and further legal and equitable relief as the court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: May 16, 2022                Respectfully submitted,

*/s/ David A. Straite*
David A. Straite
**DiCELLO LEVITT GUTZLER LLC**
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, New York  10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*

Adam J. Levitt
Amy E. Keller (admitted *pro hac vice*)
Nada Djordjevic (admitted *pro hac vice*)
James Ulwick (admitted *pro hac vice*)
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Tel.: (312) 214-7900
*alevitt@dicellolevitt.com*
*akeller@dicellolevitt.com*
*ndjordjevic@dicellolevitt.com*
*julwick@dicellolevitt.com*

Lesley E. Weaver (admitted *pro hac vice*)
Anne K. Davis (admitted *pro hac vice*)
Joshua D. Samra (admitted *pro hac vice*)

**BLEICHMAR FONTI & AULD LLP**
555 12th Street, Suite 1600
Oakland, California  94607
Tel.: (415) 445-4003
*lweaver@bfalaw.com*
*adavis@bfalaw.com*
*jsamra@bfalaw.com*

Javier Bleichmar
**BLEICHMAR FONTI & AULD LLP**
7 Times Square, 27th Floor
New York, New York  10036
Tel.: (212) 789-1340
*jbleichmar@bfalaw.com*

James J. Pizzirusso (admitted *pro hac vice*)
**HAUSFELD LLP**
888 16th Street, NW, Suite 300
Washington, D.C.  20006
Tel.: (202) 540-7200
*jpizzirusso@hausfeld.com*

Steven M. Nathan
**HAUSFELD LLP**
33 Whitehall St., 14th Floor
New York, New York  10004
Tel: (646) 357-1100
*snathan@hausfeld.com*

***Counsel for Plaintiff and the Proposed Class and Subclasses***